## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HR STAFFING CONSULTANTS, LLC, and Upstream Healthcare Management of New Jersey, LLC,**<br><br>        **Plaintiffs,**<br><br>    **v.**<br><br>**Richard BUTTS,**<br><br>        **Defendant.** | Civ. No. 2:15-3155<br>(KM)(SCM)<br><br>**CORRECTED OPINION**<br><br>**REDACTED FOR PUBLIC FILING** |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court on the motion (ECF Nos. 4, 7, 17[1]) of Plaintiffs HR Staffing Consultants, LLC ("HR Staffing") and Upstream Healthcare Management of New Jersey, LLC ("Upstream"), pursuant to Fed. R. Civ. P. 65, for a preliminary injunction against Defendant Richard Butts. HR Staffing and Upstream request that this Court enjoin Butts from working for CarePoint Health Management Associates, LLC ("CarePoint") in violation of the non-compete clause of his employment agreement with HR Staffing.[2]

On Friday, May 8, 2015, I heard oral argument on HR Staffing's application for a temporary restraining order. On Monday, May 11, 2015, I entered an order granting limited temporary relief protecting certain

---

[1]    I have considered Plaintiffs' TRO submissions (ECF Nos. 4, 7) and supplemental letter brief (ECF No. 17) in connection with this preliminary injunction application.

[2]    This Court exercises jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.

allegedly confidential information. I authorized the parties to take expedited discovery and set the matter down for a hearing.

On May 22, 2015, I held an evidentiary hearing on Plaintiffs' motion for a preliminary injunction. By stipulation, affidavits submitted by both sides were accepted by the Court in lieu of direct testimony. I heard live testimony from three witnesses: Jennifer Dobin, Richard Butts, and Christopher Howard. Both sides submitted documentary exhibits, as well as designations from the depositions.

For the reasons set forth below, this Court is persuaded that HR Staffing and Upstream have met their burden of showing that an injunction is warranted. Their motion for a preliminary injunction will therefore be GRANTED.

I.  **FINDINGS OF FACT**[3]

   a.  **Agreements between HR Staffing, Upstream, and CarePoint**

1.  CarePoint is a New Jersey for-profit hospital system operating three hospitals: Christ Hospital, Hoboken University Medical Center, and Bayonne Medical Center. (Howard Decl. ¶10.)

2.  Upstream, a New Jersey limited liability corporation, co-manages healthcare service lines for hospital systems, including CarePoint's hospitals. (*Id.* ¶¶4–7, 10.)

3.  Upstream and CarePoint are parties to a Master Management Services Agreement ("MMSA"). (*Id.* ¶11.)

---

[3]    Citations to the record are abbreviated as follows:

    Butts Decl. = Declaration of Richard Butts, dated May 8, 2015, submitted in opposition to the motion of plaintiffs, Upstream and HR Staffing, for a temporary restraining order and preliminary injunction (ECF No. 6–2)

    Butts Supp. Decl. = Supplemental Declaration of Richard Butts, dated May 20, 2015, submitted in opposition to motion for a preliminary injunction (ECF No. 19–2)

    Dobin Decl. = Declaration of Jennifer Dobin, dated May 8, 2015, submitted in opposition to motion for a temporary restraining order and preliminary injunction (ECF No. 6–1)

    Employment Agreement = Employment Agreement between HR Staffing and Butts, Plaintiffs' Ex. 2, attached as Exhibit A to the Howard Decl.

    Howard Decl. = Declaration of Christopher Howard, dated May 6, 2015, submitted in support of motion for a temporary restraining order and a preliminary injunction, Plaintiffs' Ex. 1 (ECF No. 4–2) (All Exhibits to the Howard Declaration are available at ECF No. 4-2.)

    Howard Supp. Decl. = Supplemental Declaration of Christopher Howard, dated May 18, 2015, submitted in support of motion for a temporary restraining order and a preliminary injunction, Plaintiffs' Ex. 8 (ECF No. 18) (All Exhibits to the Supplemental Howard Declaration are available at ECF No. 18.)

    Ingledue Decl. = Declaration of Paul Ingledue, dated May 20, 2015, submitted in support of motion for a preliminary injunction, Plaintiffs' Ex. 12 (ECF No. 17-6)

    PI Tr. = Transcript of evidentiary hearing on plaintiffs' motion for a preliminary injunction, held in open court on May 22, 2015.

    PSSA = Preferred Staffing Services Agreement between HR Staffing and CarePoint, Plaintiffs' Ex. 27, attached as Exhibit A to the Dobin Decl.

4. Co-management services "usually entail[] recommending the adoption of new, and/or the amendment of the hospitals existing: (a) evidence-based medicine policies, procedures and protocols, in order to measurably improve quality of care; and (b) administrative and operational policies and procedures in order to be more cost-efficient." (*Id.* ¶6.)

5. HR Staffing is a healthcare staffing company that provides personnel to hospitals and healthcare facilities. (*Id.* ¶5.)

6. HR Staffing's primary resource is its personnel. (*Id.* ¶26.)

7. Paul Ingledue and Christopher Howard own and operate Upstream and HR Staffing. (*Id.* ¶3.)

8. Pursuant to a Preferred Staffing Services Agreement ("PSSA") between HR Staffing and CarePoint, HR Staffing has provided employees, including high-level management employees, to CarePoint. (*Id.* ¶¶10, 11, Pls. Ex. 27.)

9. HR Staffing and Upstream also provide employees for various joint ventures between Upstream, CarePoint, and others. (*Id.* ¶11.)

10. HR Staffing recruits, trains, and develops the employees that it places at its joint ventures between Upstream, CarePoint, and others. (*Id.* ¶¶13, 15, 33.) It is responsible for facilitating staffing and recruitment service, adherence to performance metrics, maintaining licensure and credentials, compliance with laws and regulations, maintaining insurance, providing pre-screened staff, and providing training. (PSSA § II).

11. HR Staffing bears the costs of recruitment, training, and development. (Howard Decl. ¶33.)

12. Upstream and HR Staffing assigned employees to work in various management level positions within CarePoint's hospitals. Assigned personnel remained employed by HR Staffing and were paid by HR Staffing, although the ultimate source of their salaries was the fee

paid by CarePoint under the Staffing Services Agreement. (*Id.* ¶11; *see also* PI Tr. 64:19–65:1.) For permanent (LTP) staff, CarePoint paid HR Services on a cost-plus basis (PSSA Ex. B)

13. Richard Butts was one of the employees HR Staffing trained and assigned to work as a high-level executive at CarePoint. (Howard Decl. ¶12.)

14. At this time, Upstream and HR Staffing are in related litigation with CarePoint in the Superior Court of New Jersey, Law Division, Hudson County. *Upstream Healthcare Management of New Jersey, LLC v. CarePoint Health Management Associates, LLC*, No. HUD-L-1143-15 (Ingledue Decl. Ex. F, ECF No. 17-12; Pls. Ex. 18.)

### b. Butts's agreement with HR Staffing

15. Butts, a North Carolina resident, was an HR Staffing employee. He was placed by HR Staffing at Peninsula Heart and Vascular Services, LLC ("PHVS"). (Howard Decl. ¶¶12–14.)

16. PHVS is a co-management joint venture owned by Upstream, CarePoint, and various physicians. (*Id.* ¶12.)

17. Butts became the Executive Director of PHVS in 2011. (*Id.* ¶14.)

18. On February 17–18, 2014, HR Staffing and Butts entered into the Employment Agreement. (*Id.* ¶23; Employment Agreement.)

19. Under the Employment Agreement, Butts agreed to provide services for "Client Engagements" to which he would be assigned by HR Staffing. (Employment Agreement § I.)

20. Pursuant to the Employment Agreement, HR Staffing placed Butts as the Vice President of Cardiovascular Services for CarePoint's Hospitals. (Howard Decl. ¶24.)

21. Butts's Employment Agreement includes the following non-competition covenant, referred to by all parties as "the non-compete":

> Employee acknowledges that if he/she were to compete with Company in the furnishing of the Services as contemplated herein it would cause serious harm to Company. Employee

also acknowledges that the furnishing of the Services
requires a significant commitment of time, that the
marketplace for the services is extremely competitive, and
that Company competes against other providers of Services
located throughout the region.

Therefore, in consideration of, among other things, the
compensation to be paid by Company to Employee
hereunder and as a material condition and inducement for
Company to enter into this Agreement, and without in any
manner limiting the other restrictions imposed against
Employee under other provisions of this Agreement,
Employee hereby covenants and agrees that throughout the
term of this Agreement and during the twelve (12) month
period immediately following the expiration, termination or
non-renewal of this Agreement for any reason (collectively,
the "Restriction Period"), Employee shall not, except with
Company's prior written consent, . . . engage in the
furnishing of any aspect of the Services as contemplated
under this agreement and/or provide or enter into any
contractual relationship relating to any aspect of such
Services with any Client, hospital, health care facility,
medical group, or other party or entity to provide consulting,
management and/or other directorship services to, or
participate in the management, operation or development of,
any medical practice, hospital or other health care facility
that provides such professional medical services, at any
health care facility or other location (e.g., hospital, health
care facility, medical office, etc.) anywhere with Hudson
County and the surrounding counties (Bergen, Passaic,
Union, and Essex Counties) in which Employee provided
Services during the term of the Agreement at least twenty
(20) percent of the time.

(Employment Agreement, Amendment § II.)

22. Butts's Employment Agreement also includes the following non-

solicitation provision:

During the term of this Agreement and for a period of twelve
(12) months following the termination of this Agreement,
except with the prior written consent of Company's
President or Managing Partner, which may be provided or
withheld at his sole discretion. Employee shall not, anywhere
in the United States, directly or indirectly, whether as an
employee, consultant, owner, partner, director, officer,

shareholder, member or in any other capacity for his/her account or for the benefit of any third person or entity which he/she is, or becomes, associated: (a) Solicit, direct, influence, or attempt to influence a Client for whom Employee provided Services under this Agreement, or with whom Employee became familiar as a result of Employee's relationship with Company under this Agreement, to: (i) employ, hire or do business with Employee or any third party with which Employee is associated for the provision or development of services or products that are the same as, similar to, or otherwise competitive with any of those offered, provided or performed by Company.

(Employment Agreement, Amendment to § IX.)

23. Section VIII of the Employment Agreement, titled Term and Termination, provides that "Employee may terminate this Agreement at any time on thirty (30) days written notice to the Company." (Employment Agreement § VIII.)

24. The Employment Agreement also includes the following provision, titled Injunctive Relief, warning that HR Staffing will seek injunctive relief in the event of a breach:

The parties agree that a breach of the agreements set forth in Sections VII and IX of this Agreement may cause irreparable damage to Company, the extent of which may be difficult to ascertain, and that the award of damages may not be adequate relief. Therefore. Employee agrees that, in the event of a breach or threatened breach of any provision of Section III or IX of this Agreement, Company may institute an action to compel the specific performance of such provision, and Employee agrees not to assert adequacy of money damages as a defense and agrees that such a remedy shall be cumulative, not exclusive, and in addition to any other available remedies.

(Employment Agreement § X.)

25. The Employment Agreement also included a provision titled Entire Agreement, Waiver, Modification and Notices, which provides:

This Agreement, including the Addendum, constitutes the complete and entire agreement of the parties with respect to

its subject matter and supersedes and replaces any other
written or oral agreement or understanding between the
parties. This Agreement may be amended, modified,
supplemented or waived only by a written instrument signed
by both parties.

(Employment Agreement § XIX.)

26. Butts has resided in North Carolina and traveled some 600 miles to
New Jersey almost every week in connection with his employment at
HR Staffing and CarePoint. (PI Tr. 95:13–16; 96:2–97:3.) He has not
looked into alternative employment within a similar distance from his
home. (Butts Supp. Decl. ¶¶11–13; PI Tr. 97:8–21.)

### c. Butts's resignation

27. In or about March 2015, Butts had discussions with Ingledue and
Howard about CarePoint's interest in hiring him directly. (Butts Decl.
¶23–24.)

28. At that time, CarePoint was in the process of offering positions to
certain HR Staffing employees. (*Id.* ¶28.)

29. In or about March 2015, Butts met with Jennifer Dobin, Executive
Vice President of Human Resources for CarePoint, to discuss his
potential employment with CarePoint. (*Id.* ¶¶27, 30.)

30. Butts advised Dobin that he was subject to a non-compete clause in
his Employment Agreement with HR Staffing. (*Id.* ¶31.)

31. Dobin advised Butts to seek a waiver of his non-compete clause from
HR Staffing. (*Id.* ¶33.)

32. On March 22, 2015, Butts signed a document in which he
acknowledged that he was subject to a non-compete covenant under
the Employment Agreement. (Howard Decl. Ex. E; Pls. Ex. 6.) The
document, titled Notice of Meeting with CarePoint, includes the
following paragraph:

We take this opportunity to remind you that your
employment agreement with HR Staffing contains several
restrictions, including a non-compete provision. The non-

compete provision in your agreement with HR Staffing is meant to limit your ability to work for HR Staffing's clients, including CarePoint. Your meeting with CarePoint is not meant to limit or restrict HR Staffing's rights in any way, and HR Staffing reserves all of its rights, including its right to enforce the non-compete provisions of your employment agreement and any other rights it may have.

(*Id.*)

33. On March 31, 2015, CarePoint made an offer of employment to Butts. (Butts. Decl. ¶34.)

34. After receiving the offer, Butts disclosed it to Ingledue and Howard and asked them for a written waiver of the non-compete clause in his Employment Agreement. (*Id.* ¶35.)

35. Howard and Ingledue replied to Butts that they would not waive the non-compete clause in his Employment Agreement. (*Id.* ¶36.)

36. At first, Butts declined CarePoint's offer of employment. (Butts. Decl. ¶37.)

37. However, Butts later accepted CarePoint's offer. Butts says he did so because, in Butts's opinion, Ingledue and Howard were asking Butts to engage in "disruptive conduct to somehow further the goals" of a lawsuit initiated by HR Staffing and Upstream against CarePoint in New Jersey state court. (*Id.* ¶39.)

38. Butts filled out an employment application with CarePoint, dated May 1, 2015, and signed May 3, 2015. Although formally an application, the document states that Butts has already "received and executed" CarePoint's employment offer. (Pls. Ex. 34.)

39. On his employment application with CarePoint, Butts marked a box indicating that an agreement with a previous or existing employer includes a restriction on his ability to compete with that employer. (*Id.*)

40. On May 1, 2015, Butts sent Howard and Ingledue a resignation email, in which he wrote:

I am resigning my position from HR Staffing effective today. I would like to have communicated this in person, but I did not want to wait any longer for obvious reasons. I will forward the letter to you by this evening, and I'd be happy to discuss any transition plan that would be beneficial to all parties. I will be continuing in my capacity as VP of [cardiovascular] services with [CarePoint].

(Howard Decl. Ex. C; Pls. Ex. 4.)

41. Butts sent a formal resignation letter that same day. (Howard Decl. Ex. D; Pls. Ex. 5.)

42. Before resigning from HR Staffing, Butts provided CarePoint's Executive Director of Human Resources, Jennifer Dobin, with the personal email addresses of several HR Staffing employees. (Howard Decl. ¶53, Ex. F; Pls. Ex. 7.)

43. Sometime after Butts's communications with Dobin (*see* paragraph 42), CarePoint informed one HR Staffing employee that she was "one of the employees to be transitioned over from HR Staffing to CarePoint." (Howard Decl. ¶53, Ex. G.)

### d. Butts's access to certain information of Upstream and HR Staffing and its potential clients



44. Upstream and HR Staffing provide services to healthcare providers other than CarePoint, such as ███████████████████ ████████████████████████████████. (Howard Supp. Decl. ¶13.)

45. ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████. (*Id.*)

46. HR Staffing and Upstream shared with Butts their confidential plans to develop a ████████████████ at ████████████████ ████████████. (*Id.* ¶¶15–17, 22, Ex. A (HRS0067–HRS0071, HRS0082–HRS0087, HRS0464–HRS0466); Pls. Ex. 9.)

47. HR Staffing and Upstream's plans included a "white paper explaining

the structure of the clinical co-management company joint venture, including the underlying business objectives, clinical alignment and legal analysis for compliance" with state and federal laws. (*Id.* ¶17 (citing Ex. A (HRS0067–HRS0071, HRS0082–HRS0087, HRS0464–HRS0466); Pls. Ex. 9.)

48. The contents of that "white paper" were substantially copied from sources publicly available on the internet. (PI Tr. 123–39; Marino Decl. Ex. D.)

49. HR Staffing and Upstream planned for Butts to operate the cardiovascular service line at ▉▉▉▉▉▉. (Howard Supp. Decl. ¶¶17, 22.)

50. Butts has considerable experience, including a 2-year nursing degree; training by his previous employer (MedCath Partners, LLP) as well as HR Staffing in management within the clinical co-management model; and management of the cardiovascular service line at CarePoint's hospitals. (Butts Supp. Decl. ¶¶1–2; Howard Decl. ¶¶12–13.)

51. Butts states, however, that his lack of experience operating a cardiothoracic surgical initiative would have disqualified him from personally exploiting the business opportunities disclosed to him by HR Staffing. (Butts Supp. Decl. ¶8; PI Tr. 103:9–104:8.)

52. The cardiovascular service line at ▉▉▉▉▉▉ would compete with CarePoint for patients and physicians. (Howard Supp. Decl. ¶18.)

53. HR Staffing and Upstream also have plans to develop Clinically Integrated Networks (CINs) for ▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉. (*Id.* ¶24.)

54. The CIN initiative would be operated in hospitals that compete with CarePoint. (*Id.* ¶32.)

55. HR Staffing and Upstream shared the CIN initiative plans with Butts. (*Id.* ¶¶28–30.)

56. HR Staffing and Upstream have also discussed joint ventures with

█████████████████████████████

████████, which own and operate acute care hospitals in New Jersey, among other states. (*Id.* ¶¶34, 37.)

57. ████████'s hospitals in New Jersey compete with CarePoint. (*Id.* ¶35.)

58. The ████████ plans have also been shared with Butts. (*Id.* ¶36.)

59. The evidence did not indicate that the plans with these other hospitals have proceeded past the discussion stage, and the Court is not in a position to assess the likelihood that these plans would be consummated.

**e. HR Staffing's Preferred Staffing Services Agreement with CarePoint**

60. Jennifer Dobin is the Executive Vice President of Human Resources for CarePoint. (Dobin Decl. ¶1.)

61. Dobin was responsible for negotiating a Preferred Staffing Services Agreement between CarePoint and HR Staffing, dated August 1, 2014 ("PSSA"). (*Id.* ¶2 (citing Ex. A); Pls. Ex. 27.)

62. Pursuant to Preferred Staffing Services Agreement, HR Staffing would identify, screen, recruit, and place within CarePoint per diem and long-term staff. (PSSA.)

63. Section I(d) ("Existing LTP Staff") of the PSSA provides that:

> Staffing Company has previously supplied certain long term permanent staff to CarePoint as listed in Exhibit D ("Existing LTP Staff"). Upon notice by CarePoint, these Existing LTP Staff can be hired directly by CarePoint without payment of a placement fee. CarePoint may, in its sole discretion, assume PTO liability for such employees.

> (PSSA § I(d).)

64. Butts is one of the employees listed in Exhibit D ("Existing LTP Staff"). (PSSA Ex. D.)

65. Section VI(a) of the PSSA, titled "Non-Solicitation," reads as follows:

During the term of this Agreement and for a period of six (6) months following the termination of this Agreement, except with the prior written consent of the other party, which may be provided or withheld at that party's sole discretion, neither CarePoint nor Staffing Company may solicit, direct, influence or attempt to influence or hire, any employee or independent contractor of the other party who was employed or engaged by that party within the preceding six (6) months, to (i) become employed or retained by the soliciting party or (ii) discontinue employment or engagement with one party for the benefit of the soliciting party or any third party.

(PSSA § VI(a).)

64. CarePoint has terminated one joint venture with Upstream and HR Staffing, and has notified HR Staffing that the PSSA will terminate in August 2015. (Howard Supp. Decl. ¶44.)

## II.    ANALYSIS/CONCLUSIONS OF LAW

"A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (numbering added); *accord American Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Upstream and HR Staffing argue that the four preliminary injunction factors weigh in their favor and that this Court should enjoin Butts from working for CarePoint, in violation of the non-compete in his Employment Agreement.

I find that HR Staffing and Upstream are entitled to injunctive relief.

### a.  Likelihood of success on the merits

Upstream and HR Staffing bring claims against Butts for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3)

breach of fiduciary duty; (4) misappropriation of trade secrets; (5) breach of the duty of loyalty; (6) unfair competition; (7) civil conspiracy; and (8) conversion. (Compl., ECF No. 1.) Upstream and HR Staffing focus on injunctive relief to prevent Butts from breaching his Employment Agreement. I therefore focus my analysis on the breach of contract claim and the non-compete clause in the Employment Agreement.

To establish a breach of contract claim, HR Staffing and Upstream must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).[4]

The parties do not disagree that a valid contract existed. Their dispute focuses on the second prong: Butts's alleged breach of the non-compete.

---

[4]   "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011), *aff'd*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453, 460 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143, 962 A.2d at 453). If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 102, 629 A.2d 885, 888 (1993).

The parties seem to agree that New Jersey law applies in this diversity action. At any rate, they point to no aspect in which the application of non-forum law would change the result. Having been directed to no applicable conflict, I apply general principles of New Jersey contract law.

Butts argues that (1) the non-compete is unreasonable in that it is not necessary to protect any legitimate interests of HR Staffing, imposes an undue hardship on Butts, and would be injurious to the public; and (2) HR Staffing waived the non-compete and provided written consent for Butts to work for CarePoint in its Preferred Staffing Services Agreement with CarePoint. I do not find these arguments persuasive.

> i. *Whether the non-compete is reasonable*

Non-competition covenants, while enforceable, are scrutinized closely because they operate in derogation of free competition and the individual's right to exploit his skills and labor. A non-compete is not valid if its only purpose is to restrict competition, but it may be valid to the extent it furthers some other legitimate goal of the employer. *See Solari Indus., Inc. v. Malady*, 264 A.2d 53 (N.J. 1970); *Whitmyer Bros. v. Doyle*, 274 A.2d 577 (N.J. 1971).

Under the approach of the *Solari/Whitmyer* line of cases, a non-compete "is enforceable to the extent that it is reasonable under all of the circumstances of the case." *Karlin v. Weinberg*, 390 A.2d 1161, 1166 (N.J. 1978). A non-compete will be found reasonable if it "(1) protects the legitimate interests of the employer, (2) imposes no undue hardship on the employee, and (3) is not injurious to the public." *Id.* (numbering added; internal quotations and citations omitted); *see also The Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) (citing *Karlin*). I find that the non-compete in Butts's Employment Agreement is reasonable and that it is likely to be found enforceable.

> 1. Legitimate interests of HR Staffing

Upstream and HR Staffing have stated that the non-compete protects two legitimate business interests: protection of confidential information and the prevention of "disintermediation." Although the first concern is legitimate, I place more weight on the second.

15

Confidential information

New Jersey courts considering non-compete covenants "'recognize as legitimate the employer's interest in protecting trade secrets, confidential information, and customer relations.'" *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (quoting *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 888 (N.J. 1988)).

> [E]mployers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment.

*Ingersoll-Rand*, 542 A.2d at 894.

HR Staffing and Upstream have an interest in protecting their confidential information from CarePoint. Specifically, HR Staffing and Upstream have shared with Butts three business opportunities involving ███████████████████████████████████ ███████████████████████████████████ ██████████. (Howard Supp. Decl. ¶¶13, 15–18, 22, 24, 28–30, 32, 34–37.) These three ventures would compete with CarePoint's hospitals for patients and physicians. (Howard Supp. Decl. ¶¶17, 22, 32, 35.)

It is true that Upstream and HR Staffing's agreements with CarePoint bar them from "operationalizing" the ventures they are discussing. (*See* PI Tr. 139:14–140:25.) However, Upstream and HR Staffing's relationship with CarePoint is not stable, as evidenced by the parties' ongoing litigation in state court. (*See* Ingledue Decl. Ex. F, ECF No. 17-12; Pls. Ex. 18.) CarePoint has terminated one joint venture with Upstream and HR Staffing; Upstream and HR have the right to terminate their agreements with CarePoint at any time; and CarePoint has notified HR Staffing that the PSSA will terminate three months from now, in

August 2015. (Howard Supp. Decl. ¶44; PI Tr. 141:22–142:9.) Therefore, it is reasonable to conclude that Upstream and HR Staffing are legitimately entertaining the possibility of entering into ventures with hospitals that compete with CarePoint.

Butts, if permitted to continue on as an employee of CarePoint, would be in a position to inform CarePoint of Upstream and HR Staffing's plans and undermine these plans for CarePoint's benefit. Upstream and HR Staffing thus have a legitimate interest in keeping Butts from disclosing to CarePoint the confidential information to which he has been exposed.

I do not find, however, that Upstream and HR Staffing have a legitimate interest in the confidentiality of the business methods described in the "white paper," which derive from public sources. (*See* ¶¶47–48, *supra*.) Mr. Howard's testimony that other, joint venture related business methods are confidential was not supported by any specific information.

There was a lively dispute over the extent to which Mr. Butts owes his management skills to the training he received at HR Staffing. It is unnecessary to resolve it, at least for present purposes. While I would enforce a non-compete to protect confidential information, I would not enforce it in the interest of preventing Mr. Butts from exploiting his general expertise or the skills that he honed while in HR Staffing's employ. *See generally Rohm & Haas Co. v. ADCO Chemical Co.*, 689 F.2d 424, 432 (3d Cir. 1982) (applying NJ law). And Mr. Butts, whether or not he would have personally been qualified to head up the new ventures (*see* ¶¶49–51, *supra*), is still in a position to damage HR Staffing by informing CarePoint of them.

<u>Disintermediation</u>

Upstream and HR Staffing have a legitimate interest in preventing

what they have called "disintermediation"—that is, cutting out the middle man.[5] HR Staffing's main resource is its personnel. (Howard Decl. ¶26.) "In order to keep its business going, HR Staffing must attract train, develop, invest in, and deploy qualified people." (*Id.*) It earns its fee by placing personnel in health care operations such as CarePoint. Like any broker or middleman, HR Staffing must by contract prevent others from exploiting its efforts while cutting HR out of the process.

CarePoint's agreements with HR Staffing allow it to enjoy the benefit of HR Staffing's efforts to find, train, and place personnel. Those personnel remain HR Staffing employees, and their salaries are paid by HR Staffing. For those services, CarePoint pays HR Staffing a fee.

It is immediately apparent that, absent some contractual protection, CarePoint or any client could immediately hire away the personnel placed in its operation by HR Staffing, thereby reaping the benefit of HR Staffing's efforts while denying HR Staffing all or part of its fee. The departing employee, for his or her part, would be cutting off any benefit to HR Staffing, but only after enjoying the benefit of HR Staffing's training and placement efforts.

Upstream and HR Staffing analogize to *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553 (11th Cir. 1983).[6] In that case, the Eleventh Circuit found that protection against disintermediation was a legitimate interest of a technical service firm, a variant of an employment agency. Such a firm serves as a middleman

---

[5]     The meaning of this unusual word may be illustrated by an analogy to the business of a real estate agent. The agent's ability to earn a commission would be defeated if the buyer and seller, having been brought together by the agent, could simply sign their own contract of sale. Cutting out the agent would be an example of "disintermediation," as I understand the parties to be using the term.

[6]     The Eleventh Circuit, considering the laws of Alabama, Tennessee, and New Jersey, concluded that there was "no significant difference in the law of the three states" on these issues. *Id.* at 1557.

and provides information in the market for workers in technical fields. The workers are then recruited by client firms, who usually need short-term employees. The technical service firm thus brings together workers with client firms. In upholding the technical service firm's non-compete provision, the Eleventh Circuit reasoned that

> [the firm] had to compete with: (1) all other technical service firms; (2) conventional employment agencies; and (3) disintermediation by firms and workers. Disintermediation is the actualization of the ever-present cry to eliminate the middleman, i.e., direct solicitation, negotiation and contracting between the firm and the worker. Eliminating the middleman is at first blush a facile and attractive alternative. However, middlemen exist because they provide a useful and highly-valued service. If [the firm's] covenant with its [workers] is to have any justification, that justification must be to protect [the firm's] role as a middleman in the market for information between [workers] and client firms.

*Id.* at 1558.

HR Staffing plausibly argues that its one year non-compete, like the covenant upheld in *Consultants & Designers*, is crucial to maintaining its business. In Mr. Howard's words:

> [O]ne year allows us lead time to attract, train, and develop a replacement for a former employee without unfair competition from the employee who has departed. Additionally, in the fluid healthcare field, there is also the added protection that a one-year covenant ensures that a former employee cannot use the cutting edge information and training that they obtain from us. Sometimes strategies and information can become stale.

(Howard Decl. ¶30.)

HR Staffing's non-compete protects its role as a middleman between its employees and its client hospitals, such as CarePoint. In finding, training, and placing its employees, HR Staffing provides a service, one for which clients are willing to (promise to) pay. To freely allow disintermediation would threaten to destroy HR Staffing's business.

19

Butts maintains that prevention of disintermediation is not a legitimate, protectable business interest. He argues that *Consultants & Designers* was decided before the New Jersey Supreme Court's decisions in *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879 (N.J. 1988) and *The Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884 (N.J. 2005). Those later cases, he says, restrict an employer's legitimate interests to the protection of trade secrets, confidential information, customer relations, and "highly specialized, current information not generally known in the industry." 542 A.2d at 894. In particular, he quotes *Ingersoll*'s statement that "[m]ost courts have limited the legitimate protectable interests of an employer to trade secrets and other proprietary information . . . and customer relations." *Id.* at 893.

I do not read *Ingersoll* and *More* so narrowly. Trade secrets and such are commonly the subjects of non-compete protection, but they are not the only possible subjects. What is required is that the interest being protected be a legitimate one, distinct from the restriction of competition *per se*.

Both *Ingersoll* and *More* relied on a seminal New Jersey case, *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577 (N.J. 1971). As the *Whitmyer* court explained:

> Corbin of course recognized that the legitimate interests of the employer would include protection of his trade secrets and confidential business information along with his customer relationships but would not include the prevention of competition as such; as he put it, a postemployment restriction on an employee requires special justification which is nonexistent where 'the harm caused by service to another consists merely in the fact that the new employer becomes a more efficient competitor just as the first employer did through having a competent and efficient employee. A restraint on the employee is illegal when its purpose is the prevention of competition, except when the methods of competition to be prevented are methods commonly regarded as improper and unfair.'

274 A.2d at 582 (citing 6A Corbin, Contracts § 1394 at 100 (1962)).

In this case, Upstream and HR Staffing do not seek merely to prevent Butts, CarePoint, or anyone else from becoming a more efficient competitor. That is, they do not seek to restrict competition as such. Rather, they seek to prevent the destruction of their business model—to forestall others from appropriating *gratis* the benefit of the service they sell. I regard that as a legitimate business interest.

HR Staffing's non-compete may alternatively be viewed as protecting one of the interests specifically enumerated in *Ingersoll*: protection of customer relationships. *See Ingersoll*, 542 A.2d at 893. CarePoint may be poaching Butts, but Butts is also poaching CarePoint, which is HR Staffing's customer. Indeed, if HR Staffing's employees could jump to the client immediately after being placed there, HR Staffing's relationships with its clients would likely disintegrate.

Butts next argues that Upstream and HR Staffing have waived the non-compete by permitting other employees to defect to CarePoint. (Def. P.I. Opp. 17–19, ECF No. 19.) He contends that if Upstream and HR Staffing "were truly interested in preventing 'disintermediation,' they would not have waived their non-competition agreements with everyone except Butts." (Butts P.I. Opp. 19, ECF No. 19.) I am unpersuaded. It is reasonable for Upstream and HR Staffing to exercise some selectivity when incurring the trouble and expense of enforcing the non-compete provisions. As the Vice President of the cardiovascular service line at CarePoint, Butts was a high-level and valuable employee. It makes sense that Upstream and HR Staffing would focus their disintermediation prevention efforts on his case. *See Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 751 (D.N.J. 1998) ("Defendants' suggestion would require an employer to enforce every restrictive covenant, without regard to cost-effectiveness or individual circumstances. This is impractical and unfair."). I address and reject the remainder of Butts's

argument regarding waiver in Section II(a)(ii), *infra*.

I conclude that Upstream and HR Staffing's interests in protecting their confidential business plans and preventing disintermediation are legitimate interests, independent of the suppression of competition, that are worthy of protection by enforcement of the non-compete provision.

### 2. Undue hardship

Second, Butts argues that enforcing the non-compete would impose an undue hardship upon him. The scope of the non-compete, however, is reasonable. I add that any hardship Butts may be incurring is almost entirely attributable to himself.

Butts's non-compete is narrow in both temporal and geographic scope. He is restricted from working in five counties in New Jersey for one year. (Employment Agreement, Amendment, Section II.) Although each covenant must be evaluated on its own terms, I do note that similar non-compete clauses have routinely been upheld as reasonable. *See, e.g.*, *The Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) (enforcing a two-year covenant covering a thirty-mile radius); *Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1040 (N.J. Super. Ct. Law Div. 1995) (enforcing a restrictive covenant with a one-year term); *Schuhalter v. Salerno*, 653 A.2d 596, 599 (N.J. Super. Ct. App. Div. 1995) ("covenant duration of two years is generally held to be reasonable" (internal quotation and citation omitted)); *Hogan v. Bergen Brunswig Corp.*, 378 A.2d 1164 (N.J. Super. Ct. App. Div. 1977) (enforcing one-year restriction covering Essex and Union counties); *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 224–25 (D.N.J. 2009) (enforcing one-year, 50-mile restriction under New Jersey law).

One year appears to be a reasonable time for HR Staffing to train a replacement. The five counties are a reasonable approximation of the area in which CarePoint and its competitors operate. (*See* ¶¶1, 5–11, 52,

54, 57, *supra*; *see also* PI Tr. 91–94, 104–06.) For one year, Butts may find similar employment anywhere outside of those five New Jersey counties. Once the year has elapsed, he may work anywhere, and for anyone—including Carepoint—that he chooses. I am therefore satisfied that Butts's non-compete is "narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *More*, 869 A.2d at 897.

Courts evaluating the hardship prong have considered "the likelihood of the employee finding work in his field elsewhere." *Karlin*, 390 A.2d at 1169. As to that factor, the employee's own role in bringing about his hardship is important:

> The trial court should examine also the reason for the termination of the relationship between the parties to the employment contract. Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may fairly be characterized as "undue" in that the employee has not, by his conduct, contributed to it. On the other hand, where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself. Ordinarily a showing of personal hardship, without more, will not amount to an "undue hardship" such as would prevent enforcement of the covenant.

*Id.*; *see also More*, 869 A.2d at 898 ("If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play.").

Butts testified that he lives in North Carolina and has traveled to New Jersey almost every week in connection with his employment here. (*See* ¶26, *supra*; PI Tr. 95:13–16; 96:2–97:7.) In support of his contention

that alternative employment is unobtainable, Butts declared that "[t]here is only one major health care system within reasonable commuting distance to my residence in North Carolina." His "commuting distance" now, however, is about six hundred miles. He acknowledged on cross-examination that he had not looked into employment opportunities within a six hundred mile radius of his home. (Butts Supp. Decl. ¶¶11–13; PI Tr. 97:8–21.)

In the larger sense, of course, this non-compete did not stand in the way of this employee's leaving for greener pastures. Butts remains precisely where he was, as Vice President of Cardiovascular Services at CarePoint. By doing nothing, he could have continued to enjoy his present position and salary indefinitely.[7] He has swapped bosses, not jobs. The practical effect of his departure is to remove HR Staffing from the chain of command.

Finally, I consider the equities of Butts's departure. Butts actually, subjectively knew he was subject to the non-compete. He sought, and was denied, a waiver of the non-compete. He acknowledged the existence of the non-compete in writing in several places, including his very application for employment at CarePoint. (¶¶ 21, 30–35, 39.) Having left without giving the required 30 days' notice (¶23, *supra*), he can hardly complain that he has been subjected to an emergent application for injunctive relief. In short, Butts transferred his loyalties to CarePoint, knowingly violated the non-compete provision, and took a chance that HR Staffing would not enforce it. For this reason, too, any hardship Butts

---

[7]     That is not to say that Butts had no reasons for what he did. At the time, disputes between HR Staffing and CarePoint over, *inter alia,* unpaid invoices, were escalating. Butts felt he was being placed in the middle of unfair or even unethical pressure tactics by HR Staffing. I make no findings as to those intercorporate disputes, which are the subject of state court litigation. (*See* ¶14, *supra.*) I state only that the disputes between HR Staffing and CarePoint do not tip the equities as between HR Staffing and Butts. And Butts's feeling that things had grown "hostile" (PI Tr. 62) does not excuse his failure to give the required 30 days' notice.

may be suffering cannot be fairly characterized as "undue."

Therefore, the "hardship" factor weighs in favor of enforcing the non-compete.

### 3. Public interest

The public interest factor weighs in favor of granting a preliminary injunction.

The *Karlin* court identified two significant public interest factors a court should consider: "the demand for the services rendered by the employee and the likelihood that those services could be provided by other [employees] already practicing in the area." *Karlin*, 390 A.2d at 1169–70 (*Karlin* involved a physician). The New Jersey Supreme Court has also recognized the public's interest "in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and techniques in which the employer may be said to have a proprietary interest." *Ingersoll*, 542 A.2d at 894.

Butts argues that a preliminary injunction would undermine "the safe and efficient operation of a hospital system." (Def. P.I. Opp. 22.) However, as Upstream and HR Staffing point out, Butts is an administrator, not a doctor. (Pls. TRO Mot. 8–9, ECF No. 4.) There is no indication that patient care would suffer, that he is irreplaceable at CarePoint, or that others could not perform his current executive functions.[8]

The public has an interest in upholding reasonable, bargained-for provisions of contracts. *See Manhattan Associates, Inc. v. Ruderman*, No.

---

[8]    CarePoint maintains that it knew nothing of Butts's non-compete until relatively late in the process, perhaps not until April 2015. There is no dispute, however, that it took Butts on with the understanding that he was subject to a non-compete with HR Staffing. (Butts Decl. ¶¶31, 33.) Thus, this preliminary injunction does not come without warning to those it may harm.

CIV. 05-3928 (GEB), 2005 WL 2290297, at *7 (D.N.J. Sept. 20, 2005). The public has an interest in safeguarding an employer's confidential information. And the public has an interest in protecting Upstream and HR Staffing's business model. As the Eleventh Circuit noted, "middlemen exist because they provide a useful and highly-valued service." *Consultants & Designers, Inc.*, 720 F.2d at 1558.

I find that the public interest prong weighs in favor of enforcing the non-compete.

### ii.   Whether HR Staffing waived Butts's non-compete

Butts has not established that HR Staffing waived the non-compete in his Employment Agreement, either by its statements or by virtue of the PSSA between HR Staffing and CarePoint.

"Waiver is the voluntary and intentional relinquishment of a known right." *Cole v. Jersey City Med. Ctr.*, 72 A.3d 224, 231 (N.J. 2013) (internal quotations and citation omitted.) "[A] party need not expressly state its intent to waive a right; instead, waiver can occur implicitly if the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." *Id.* (internal quotations and citation omitted). However, "[s]uch a waiver must be done clearly, unequivocally, and decisively." *Id.* (internal quotations and citation omitted). The evidence in the record shows that HR Staffing did not waive Butts's non-compete.

Butts first focuses on the PSSA between HR Staffing and CarePoint, arguing that it overrode or waived the non-compete in his own Employment Agreement. (Butts P.I. Opp. 10–11; 20–21.) Section I(d) of the PSSA Section I(d) ("Existing LTP Staff") provides as follows:

> Staffing Company has previously supplied certain long term permanent staff to CarePoint as listed in Exhibit D ("Existing LTP Staff"). Upon notice by CarePoint, these Existing LTP Staff can be hired directly by CarePoint without payment of a

> placement fee. CarePoint may, in its sole discretion, assume PTO liability for such employees.

This provision, says Butts, independently authorizes CarePoint to hire him, irrespective of his non-compete.

Butts, however, was not a party to the PSSA, and the PSSA does not purport to settle the rights of Butts and HR Staffing vis-à-vis each other. The agreement Butts *did* sign—his Employment Agreement, which contains the non-compete—provides that it may be modified "only by a written instrument signed by both parties." (Employment Agreement § XIX.) The PSSA is not a contract "signed by both parties" (*i.e.*, by HR Staffing and Butts); Butts is not a party to the PSSA at all. And Butts acknowledges that he never received a written waiver of the non-compete, as required by the Employment Agreement. (*E.g.*, ¶¶31–35, *supra*; Butts Decl. ¶¶35–36; PI Tr. 76:2.)[9]

Butts next focuses on his oral conversations with Ingledue and Howard which, he says, led him to believe that the non-compete was waived. As established above, Butts's Employment Agreement can only be modified or waived by a written instrument signed by both parties. Whatever doubts Butts may have had about a potential waiver should have been cleared up by (1) the document he signed on March 22, 2015, acknowledging that he was subject to a non-compete (Howard Decl. Ex. E; Pls. Ex. 6); and (2) Ingledue and Howard's explicit refusal to provide Butts with a written waiver of the non-compete (¶¶31–35, *supra*; Butts Decl. ¶¶35–36; PI Tr. 76:2.)

I find that HR Staffing has not agreed to waive the non-compete clause of Butts's Employment Agreement.

---

[9]     A violation of the PSSA, moreover, might well give rise to a cause of action as between CarePoint and HR Staffing, but it does not affect HR Staffing's rights as against its employee, Butts. I do not analyze the claim of breach of the PSSA here.

### b. Irreparable harm

Upstream and HR Staffing have established that they will suffer irreparable harm if Butts continues to work for CarePoint and the non-compete in his Employment Agreement is not enforced.

Harm is considered "irreparable" if it is not redressable by money damages at a later date, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citing *Sampson v. Murray,* 415 U.S. 61, 90 (1964)).

First, Butts has been exposed to confidential information regarding Upstream and HR Staffing's potential business ventures that would compete with CarePoint. (Howard Supp. Decl. ¶¶13, 15–18, 22, 24, 28–30, 32, 34–37.) Butts's position at CarePoint enables him to inform CarePoint about Upstream and HR Staffing's plans, to CarePoint's benefit and to Upstream and HR Staffing's detriment. The loss of these business opportunities would irreparably harm Upstream and HR Staffing.

Second, HR Staffing would be irreparably harmed by Butts's continued employment in violation of his non-compete. This lawsuit will likely span more than one year, at which point the enforcement of Butts's non-compete will become moot. Allowing Butts to remain at CarePoint would irreparably harm Upstream and HR Staffing's efforts to prevent disintermediation. Effectively, CarePoint would have eliminated the middleman at the cost of maintaining this lawsuit.

Thus, the irreparable harm prong warrants granting a preliminary injunction.

### c. Balancing the equities and the public interest

The final two prongs, balancing of the harms and the interest of the public, also weigh in favor of granting injunctive relief.

As I have explained in Section II(a)(i)(3), the public interest warrants enforcement of the non-compete provision of Butts's employment contract and enjoining him from working for CarePoint.

I have also discussed Butts's hardship in Section II(a)(i)(2), *supra*. Within the next year, Butts may seek employment anywhere outside of five counties in New Jersey, after one year he may seek employment with CarePoint or any other entity. At the time of his resignation, Butts was aware of his non-compete and knew that HR Staffing did not formally waive it. He took a calculated risk in resigning from HR Staffing, and it did not pay off. Any hardship Butts may endure was brought upon himself. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." (internal quotation and citation omitted)).

For the reasons discussed above, HR Staffing and Upstream have a legitimate interest in maintaining their business model (preventing disintermediation) and keeping their confidential information from potential competitors. Equity therefore favors granting injunctive relief.

## III.   SECURITY

Pursuant to the Federal Rules, this Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ." Fed. R. Civ. P. 65(c).

Therefore, I will require Upstream and HR Staffing to give security in the amount of Butts's annual salary at CarePoint. Butts will document that amount to HR Staffing, if necessary.

## IV.   INJUNCTIVE RELIEF

In light of the foregoing, I will grant Upstream and HR the following injunctive relief:

29

Defendant Richard Butts shall be restrained from:

1. Violating the non-compete and non-solicitation provisions of his Employment Agreement with HR Staffing, including, but not limited to, being employed by CarePoint Health Management Associates, LLC, and/or any of its related entities (collectively, "CarePoint"); and,

2. Violating the confidentiality provisions of his Employment Agreement with HR Staffing, including, but not limited to, disclosing to CarePoint any confidential or proprietary information, or trade secrets of Plaintiffs.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (ECF Nos. 4, 7, 17) is GRANTED. By Monday, June 1, after consultation with counsel for Defendant, Plaintiffs' counsel shall

(1) submit a form of preliminary injunction, which shall include the amount of bond and require the posting of such security within 30 days;

(2) propose redactions so that a version of this sealed Opinion may be filed publicly.

Dated: May 29, 2015
[as corrected 6/1/2015 and redacted 6/2/2015]

_____
**KEVIN MCNULTY**
**United States District Judge**

30